FRANK SCHALLINGER, administrator, *vs.* THE GREAT ATLANTIC AND PACIFIC TEA COMPANY (and a companion case[1]).

Suffolk.    April 3, 4, 1956. — July 2, 1956.

Present: QUA, C.J., WILKINS, WILLIAMS, COUNIHAN, & WHITTEMORE, JJ.

*Negligence,* One owning or controlling real estate, Snow and ice, Store. *Landlord and Tenant,* Control of premises, Tenant's liability to third person, Landlord's liability to third person, "Outside" portion of premises, Advertising device, Construction of lease. *Snow and Ice.*

Evidence warranted a finding that a patch of ice near the entrance door of a store in a recessed entranceway in the control of the proprietor of the store, a lessee of the store building, had been there so long that he knew or ought to have known of its existence and should have remedied it before a prospective customer entering the store from the sidewalk slipped and fell on it, and warranted a finding of negligence on the part of the proprietor toward the prospective customer. [390]

A recessed, covered vestibule or entranceway containing a door on each side and open at the front, which was located midway in the front wall of a single story building bordering on a sidewalk and wholly occupied as a store by a lessee, was a part of the lessee's store and was not an "outside" portion of the building within provisions of the lease that the lessee was to "assume only such degree of control of the outside part of the premises . . . [as was] necessary for the installation and maintenance of" advertising devices for which the lessee was given the right "of using all available outside wall and roof space," and that the lessor was "to retain . . . control of said outside portions of the premises for all other purposes and in connection with determining his liability to third persons for . . . injuries which may result from defects . . . snow and ice"; and the lessee was in control of the entranceway with respect to the duty of exercising reasonable care to

[1] The companion case is by the same plaintiff against H C B Realty Company.

keep it in a reasonably safe condition for use of the customers of his store. [390–391]

Under provisions of a lease of a single story store building built to the lessee's specifications, that the lessee might use "all available outside wall and roof space" for advertising devices, that the lessee was to "assume only such degree of control of the outside part of the premises . . . [as was] necessary for the installation and maintenance of" the devices, and that the lessor was to "retain . . . control of said outside portions of the premises for all other purposes and in connection with determining his liability to third persons for . . . injuries which may result from defects . . . snow and ice," the lessor did not have control of a horizontal metal "awning" or shelf extending across the front of the store over the entrance and show windows and used as a base for large advertising letters, or control of the letters, and, even if water dripping from melting snow and ice on the "awning" and the letters created a patch of ice on the sidewalk and the entrance, was not liable for the death of one resulting from injuries incurred in slipping and falling on the patch of ice. [391–392]

Two ACTIONS OF TORT. Writs in the Superior Court dated February 15, 1951.

The actions were tried before *Collins,* J.

*Charles W. O'Brien,* for The Great Atlantic and Pacific Tea Company.

*Isadore Bloom,* for the plaintiff.

*Bertram A. Sugarman, (Edward J. Barshak* with him,) for the H C B Realty Company.

WILLIAMS, J. These are actions of tort, tried together to a jury, to recover for the death and conscious suffering of the plaintiff's intestate resulting from his fall on February 28, 1950, on an accumulation of ice at the entrance of a building numbered 1486 on Tremont Street in Roxbury caused by the alleged negligence of each of the defendants. The building in question which was of one story with a flat roof had been erected in 1941 by one Gould, the predecessor in title to the defendant H C B Realty Company, according to specifications supplied by the prospective tenant of the building, the defendant The Great Atlantic and Pacific Tea Company. The building had, by arrangement previous to its erection, been leased to the tea company for a term of five years from August 1, 1941, with an option of renewal for a like term. On February 28, 1950, the tea company

was occupying the entire building as a store under a lease which provided that "the lessee's rights and interest under the within lease include that of using all available outside wall and roof space for the purpose of advertising its own and allied products and for any other purposes in any way allied with the general business of the lessee; such right to include the erection of suitable advertising billboards when necessary. It is fully agreed and understood as a part of this covenant that the lessee is to assume only such degree of control of the outside part of the premises so used, as is necessary for the installation and maintenance of said signs or billboards, and the lessor is understood to retain and remain in possession of [*sic*] control of said outside portions of the premises for all other purposes and in connection with determining his liability to third persons for any and all injuries which may result from defects, failure to repair, or accumulations of snow and ice."

The building had a frontage of fifty-two feet, faced to the north, and adjoined a twelve foot sidewalk. Its appearance is shown on several photographs which were in evidence. There was a down grade from the westerly corner of the building to its easterly corner of two feet six and five-eighths inches. Midway in the front was a recessed entranceway five feet six inches deep, twelve feet three inches wide at the sidewalk and six feet two inches at the rear. The rear of the recess was two and one quarter inches lower than at the sidewalk line. On each side of the recess was a door, that on the westerly side, which was for entrance to the premises, being four feet wide and swinging in from a point "almost" one foot from the westerly corner of the recess.

There was evidence that the decedent approached the store, where he was intending to make a purchase, from the west. When he reached the westerly corner of the recessed entranceway he turned to his right to enter the store and as he stepped forward with his right foot within the recess and reached over with his right hand for the metal cross bar on the entrance door to his right slipped on a patch of ice located partly in the recessed entranceway and partly on

the adjacent sidewalk, fell on his back, and received injuries from which he subsequently died. The ice on which he fell was lumpy, dirty, hard packed ice with a little moisture on top. It was oval shaped, extended about two and one half feet from a point within the recess a half inch in front of the entrance door out to and onto the sidewalk, and was about two feet in width and about three or four inches thick, thicker near the door and thinning out to the sidewalk. "The other portion of the sidewalk in front of the store premises, except for this patch of ice . . . , was clear of ice except that there was ice and snow in the gutters and at the curbing of the sidewalk and in different patches in different places further down from the entranceway and there were also ridges of lumpy ice in front of the building directly under the metal awning . . . and these ridges of ice were right near the building and led from near the westerly corner of the front of the building to the westerly corner of the entranceway up to the aforesaid patch of ice." The so called metal awning was a horizontal shelf eleven inches wide extending along the front of the building over the show windows and entranceway on which rested large letters spelling "Super A & P Market." The letters comprising the words Super and Market were about eighteen inches high, and the letters A and P were about two feet ten inches high and two feet wide. All were attached to the brick wall of the building and could be lighted by a series of spotlights placed above them.

"On the day of the accident, there were about four inches of snow and ice on the metal awning and . . . also icicles and a lot of snow and ice on the top of the said letters . . . extending the whole width of the sign, and there was melting and dripping from the ice and snow on top of each letter. There were also icicles hanging from the metal awning and over its edge dripping water on to the sidewalk underneath the awning where there were ridges of ice, lumpy ice, on the sidewalk near the building and along the front wall of the building leading to the aforesaid patch of ice." The patch of ice "was in approximately the same condition, size and

appearance" on Saturday, February 25, and on Monday, February 27. Employees of the tea company cleaned the sidewalk in front of the store and on February 28 had cleaned or salted or sanded the entranceway about two hours before the accident.

Each of the plaintiff's declarations contained two counts, one for conscious suffering and one for death, and the jury returned verdicts for the plaintiff on all counts. The defendants filed motions for directed verdicts at the conclusion of the evidence which were denied subject to the exceptions of the respective defendants. After the verdicts, a motion of the tea company for the entry of verdicts in its favor under leave reserved was denied subject to its exception. A similar motion of the realty company was allowed and the plaintiff excepted.

There was no error in permitting the verdicts against the tea company to stand. One who invites a business visitor to enter his premises owes to such visitor the duty to use reasonable care to keep the premises in a reasonably safe condition for the visitor's use. *LeBlanc* v. *Atlantic Building & Supply Co. Inc.* 323 Mass. 702, 705. *Willett* v. *Pilotte,* 329 Mass. 610, 613. This duty extends to that part of the premises which is maintained for the visitor's entrance and exit. See *Lanagan* v. *Jordan Marsh Co.* 324 Mass. 540. The patch of ice could be found to be a source of danger to customers entering the store and to have been there for such period of time that the tea company knew or should, in the exercise of care, have known of its existence and have remedied the condition. It could not have been ruled that the entranceway and the ice that had accumulated therein, whatever the cause of the accumulation may have been, were not in the control of the tea company. Except for the provision of the lease whereby the realty company retained, with the exception heretofore stated, control of "outside portions of the premises," the tea company, as lessee of the building, would be the party liable to third persons for negligence in the maintenance of the leased premises. *Hannon* v. *Schwartz,* 304 Mass. 468, 470. *Blanchard* v. *Stone's Inc.*

304 Mass. 634, 639. *Nunan* v. *Dudley Properties, Inc.* 325 Mass. 551, 553. The area of the entranceway was not an "outside" portion of the premises as were the uncovered rear steps on which the plaintiff in the *Nunan* case was injured. This recessed area was a covered vestibule, open at the front, located within the line of the front wall of the building which bordered on the sidewalk and a part of the store occupied by the tea company. The evidence did not warrant findings as to control which would relieve the tea company from responsibility for maintaining it in a safe condition for customers.

The liability of the realty company depends on whether the evidence was sufficient to show its control over the metal awning and letters from which, the plaintiff contends, melting snow and ice dripped and formed the patch of ice at the entranceway. As already stated, except for the provisions of the lease, control of the entire leased building would be in the lessee, which would be the party liable to third persons for negligence in the maintenance of the leased premises. But by the lease the tea company was relieved from the responsibilities attendant on control of the outside portions of the premises except portions used for the installation and maintenance of its advertising media. The point for decision is whether the source of the drippings, assuming those drippings could be found to have caused the formation of the patch of ice, was in the control of the realty company. The lease, in which the name of the tea company is printed as lessee, appears to be of a standard form for use when, as here, a building shall be erected by a landowner for its intended occupancy. It requires the building to be erected according to its specifications and blueprints. The metal awning was a part of the original construction of the building and presumably conformed to the tea company's specifications. In the absence of other evidence its subsequent use by the tea company as a base for its letters implies that this was at least one of the purposes for which it was designed. Being constructed of aluminum or stainless steel it would accentuate by reflection the il-

lumination of the letters from the spotlights above. We think it plain that the awning, the letters, and the lights were part of the advertising scheme of the tea company the maintenance of which was intended by the terms of the lease to be controlled by the lessee. See *Shepard* v. *Worcester County Institution for Savings*, 304 Mass. 220; *Hannon* v. *Schwartz*, 304 Mass. 468; *Blanchard* v. *Stone's Inc.* 304 Mass. 634; *Dalton* v. *Great Atlantic & Pacific Tea Co.* 241 Mass. 400; *Anderson* v. *Kopelman*, 279 Mass. 140; *Minkkinen* c. *Nyman*, 325 Mass. 92. It follows that the realty company retained no control over these adjuncts to the building and was not responsible for the creation of danger to third persons resulting from their maintenance. *Quinn* v. *Crimmings*, 171 Mass. 255, 256. *Wixon* v. *Bruce*, 187 Mass. 232, 235.

There was no error in entering verdicts for the realty company under leave reserved.

*Exceptions overruled.*